**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Kimberly V. Beck,<br><br>                              Plaintiff,<br><br>            -v-<br><br>Metropolitan Bank Holding Corp. and JPMorgan Chase Bank, N.A.,<br><br>                              Defendants. | 2:23-cv-07564<br>(NJC) (ARL) |

## <u>OPINION AND ORDER</u>

Plaintiff Kimberly Beck ("Beck") brings this action against Defendant JPMorgan Chase Bank, N.A. ("Chase")[1] for allegedly failing to adopt and implement security procedures reasonably designed to protect her, a customer, from sending money from her Chase account to a recipient in response to fraudulent communications by non-parties. (Not. of Removal Ex. B ("Am. Compl.") at 1, ECF No. 1-2.) Beck brings claims against Chase under New York common law for breach of contract, breach of the covenant of good faith and fair dealing, and negligence. (*Id.* at 6–9.) Chase moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P., arguing that Beck's claims are preempted by Article 4-A of New York's Uniform Commercial Code or, in the alternative, should be dismissed for failure to state a claim. (Mot., ECF No. 19; Mem. of Law ISO Mot. ("Chase's Br.") at 1, 11, ECF No. 19-1.)

Before me is the fully-briefed motion. For the reasons discussed below, I grant the motion and dismiss the Amended Complaint.

---

[1] Defendant Metropolitan Bank Holding Corporation has been dismissed from this action. (*See* Op. & Order at 1, ECF No. 22; Not. of Removal Ex. A at 32, ECF No. 1-1.)

**FACTS**

I assume as true all well-pled allegations in the Amended Complaint and draw all reasonable inferences in favor of Beck in considering Chase's motion to dismiss. *See Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 318 n.2 (2d Cir. 2021). The following facts are taken from the Amended Complaint,[2] as well as two wire transfer agreements ("Agreements") integral to the Amended Complaint.[3]

In February 2023, Beck was contacted by scammers who, over the course of several days, convinced her to send them a total of $77,800 through two wire transactions and pre-paid gift cards. (Am. Compl.) Beck first received a "security breach alert" on her computer on February 15, 2023, and was instructed to call Apple technical support at a phone number the alert provided. (*Id.* ¶¶ 11, 12, at 3.) Beck called the number and spoke with "highly sophisticated threat actors" (the "Scammers") who she believed were Apple support employees. (*Id.* ¶ 12, at 3.) These Scammers "successfully coerced [her] into believing that her bank[] accounts had been compromised by hackers and that the individuals on the phone were going to help [Beck] by moving her money into a more secure account that the hackers could not breach." (*Id.*)

---

[2] The Amended Complaint contains numerous duplicate paragraph numbers. Accordingly, citations to the Amended Complaint include references to paragraph and page numbers.

[3] At the motion to dismiss stage, a court "may consider documents that are attached to the complaint, incorporated in it by reference, integral to the complaint, or the proper subject of judicial notice." *Jajati v. JPMorgan Chase Bank, N.A.*, No. 22-cv-07676, --- F. Supp. 3d. ---, 2024 WL 99659, at *2 (E.D.N.Y. Jan. 9, 2024) (citing *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020)). A document is "integral to a complaint" where the plaintiff has "(1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." *Id.* Here, the Amended Complaint brings a breach of contract claim alleging that Chase violated the parties' Agreements and directly refers to the text of the Agreements. (*See generally* Am. Compl.) Accordingly, the Agreements are integral to the Amended Complaint and are properly considered on a motion to dismiss. *See Jakob v. JPMorgan Chase Bank, N.A.*, 639 F. Supp. 3d 406, 410–11 (E.D.N.Y. 2022) (considering a wire transfer agreement in deciding a motion to dismiss where the agreement was referenced in the complaint).

Beck has a Chase bank account ending in digits 9309 ("9309 Account"). (Am. Compl. ¶ 9, at 2.) At the direction of the Scammers, Beck went to the Chase location at 925 Montauk Highway, Bayport, New York 11706 ("Bayport Chase Branch") on February 15, 2023. (*Id.* ¶ 14, at 3.) At 9:45 AM that morning, she withdrew $10,000 from a checking account. (*Id.* at ¶ 13, at 3.) Beck withdrew this amount because the Scammers had instructed her to use that money to buy pre-paid gift cards. (*Id.* at ¶ 14, at 3.)

On February 17, 2023, the Scammers contacted Beck a second time. (*Id.* ¶ 16, at 4.) Beck believed the Scammers to be "Apple advisors." (*Id.*) They "deceived [her] into believing that her Chase Bank account had been breached and was at risk of being compromised" and that, in order to protect her money, Beck would have to transfer it via wire transfer into a "government dummy" account that the hackers could not breach. (*Id.* ¶¶ 16–17, at 4.) The Scammers provided Beck with instructions to go to the Bayport Chase Branch and transfer by wire $39,800 from Beck's Chase account to an account held by "Gyorgy Bora" at "Metropolitan Commercial Bank at 1359 Broadway, New York, NY" ("First Wire Transfer"). (*Id.* ¶¶ 18, 21, at 4.) Throughout this telephone communication, the Scammers "were using threats and intimidation to coerce [Beck] into following their instructions." (*Id.* ¶ 19, at 4.)

The Scammers contacted Beck for a third time the following day, February 18, 2023. (*Id.* ¶ 22, at 4–5.) "Through the same use of threats and forms of deception," the Scammers convinced Beck to go to a Chase bank location on 115 East Main Street, Patchogue, New York 11772. (*Id.* ¶ 22, at 4–5.) Beck then sent $20,000 by wire transfer to an account held by "Miss Iosif Lacatos" at "Metropolitan Commercial Bank" ("Second Wire Transfer," together with the First Wire Transfer, the "Wire Transfers"). (*Id.* ¶¶ 22, 24, at 5.)

According to the Amended Complaint, Chase "ignored various red flags" in processing the Wire Transfers, including:

> the large amount of money being transferred, that the money came from [Beck's] savings account, [Beck's] age and financial status, that [Beck] has no prior history of sending any such wire transfers as a customer of JPMorgan Chase bank, [and] that the name of the recipient party is "Gyorgy Bora" and fails to provide the recipient's street address or other identifying information.

(*Id.* ¶ 21, at 4.)[4] The Amended Complaint does not otherwise allege Beck's age or her financial status.

Before executing each wire transfer, Beck signed a wire transfer agreement with Chase (collectively, the "Agreements"). (*Id.* ¶ 26, at 5; Cortese Aff. at 2–8 ("Agreement 1"), 9–14 ("Agreement 2"), ECF No. 19-3.)[5] The first page of each Agreement identifies the "Wire Transfer Sender," the "Recipient Account," and the "Receiving Bank," and provides information about the "Wire Transfer" itself. (*Id.* at 4, 10.) Both Agreements identify the "Wire Transfer Sender" as "Kimberly Beck." (*Id.*) Agreement 1 shows that Beck requested a wire transfer in the amount of $39,800 from the 9309 Account on February 17, 2023, at 11:30 AM for delivery to the "Recipient Account" of "Gyorgy Bora" at the "Receiving Bank" of "Metropolitan Commercial Bank." (*Id.* at 4.) Agreement 2 reflects that, on February 18, 2023, at 11:42 AM, Beck requested a wire transfer in the amount of $20,035 from the 9309 Account for delivery to the "Recipient Account" of "Miss Iosif Lacatos" at the "Receiving Bank" of "Metropolitan Commercial Bank." (*Id.* at 10.)

---

[4] Excerpts from the Amended Complaint are reproduced here exactly as they appear in the original. Unless otherwise noted, errors in spelling, punctuation, or grammar will not be corrected or highlighted.

[5] The opinion will refer to the ECF-generated pagination of the Cortese Affidavit, rather than the internal pagination within each Agreement.

The remaining pages of both Agreements set forth identical "terms and provisions." (*Id.* at 5–8, 11–14.) Section 1 provides that "[t]he terms and conditions of this [Agreement] describe our wire transfer service, including what you can expect from us (JPMorgan Chase Bank, N.A.) and the security procedures we will take when you send a wire transfer." (*Id.* at 5, 11.) Section 2 sets forth the parties' agreement regarding Chase's wire transfer security procedures, stating:

> These security procedures are only to help prevent unauthorized access to your account. All wire transfer requests go through an internal review, and we may need to contact you to verify information about your wire transfer. We may impose stricter security procedures for any particular wire transfer you make, but we have no obligation to do so. If we choose to impose stricter security procedures, we will not be liable to you for any delays or losses, and we will not be obligated to impose such security procedures in the future.

(*Id.* § 2, at 5, 11.) For wire transfers made through a Chase Bank branch, the Agreements provide that:

> When you request a wire transfer in a branch you will be required to provide your signature as authorization for each wire transfer and show valid identification. You acknowledge these security procedures used for wire requests you make in a branch are a commercially reasonable method of verifying your branch wire transfer. You are responsible for any wire transfer issued in your name using these security procedures, whether or not you actually authorized the transfer.

(*Id.* § 2(a), at 5, 11.) As to the laws applicable to the agreement, the Agreements state:

> The use of this service is subject to all applicable U.S. federal and state laws, regulations, rules and wire transfer arrangements, including the respective state's Uniform Commercial Code Article 4A, as may be applicable, which, in the event of a conflict with this Agreement, will govern.

(*Id.* § 8, at 6, 12.) The Agreements also include an indemnification provision, stating that:

> You will indemnify us for all claims, expenses, liabilities, and losses (including reasonable legal fees) if you or a third party makes a claim against us for any of our actions or services in this Agreement, unless they prove gross negligence or willful misconduct. . . .

(*Id.* § 9, at 6, 12.)

At the bottom of the fourth page of the Agreements, above the signature line, the Agreements include a warning in large, bold letters, cautioning the person sending the wire transfer to "**[b]e aware of wire scams, because once the wire is sent, you may not be able to recover your money**." (*Id.* at 7, 13.)  Directly below that warning, both Agreements provide that "[b]y providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer." (*Id.*) Beck signed both Agreements on the "Sender's Signature" line. (*Id.*) Beck's signature is dated February 17, 2023 on Agreement 1, and February 18, 2023 on Agreement 2. (*Id.*)



The fifth and final page of both Agreements includes a box titled "Branch / Department Information" containing spaces to provide information about Chase's approval, review, and acceptance or rejection of a wire transfer and the name of the Chase employees involved. (*Id.* at 8, 14.) The First Wire Transfer was "[i]nitiated by: Jessica Marquez" and "[a]pproved" by "Lesley Bullis." (*Id.* at 8.) The Second Wire Transfer was initiated by "Jigisha Patel" and was "[a]pproved" by "Denise Stone." (*Id.* at 14.)

**Branch / Department Information**
Initiated by: JESSICA MARQUEZ   Initiating Branch: Patchogue Village   Phone: 631-207-1725   Request Time: 11:13:27AM
Wire Transfer: ☒ Approved  ☐ Declined   Approved/Declined by (Print): _Lesley Buttis_
Approved/Declined by (Signature): _____   Date: 2/17/23
Decline Reason: _____   Comments: _____
Approving Manager (wire amount over limit): _____
Method of Approval (attach required supporting documentation) ☐ Phone call ☐ Email ☐ Other (explain) _____
Wire Tracking Information
FX Contract Number (if applicable) _____

**Branch / Department Information**
Initiated by: JIGISHA PATEL   Initiating Branch: Sayville - 747338   Phone: 631-589-0701   Request Time: 11:42:23AM
Wire Transfer: ☒ Approved  ☐ Declined   Approved/Declined by (Print): _Denise Stone_
Approved/Declined by (Signature): _Denise Stone_   Date: 2/18/23
Decline Reason: _____   Comments: _____
Approving Manager (wire amount over limit): _____
Method of Approval (attach required supporting documentation) ☐ Phone call ☐ Email ☐ Other (explain) _____
Wire Tracking Information
FX Contract Number (if applicable) _____

## PROCEDURAL HISTORY

On January 29, 2023, Beck filed a verified complaint in the Supreme Court of New York, Suffolk County, asserting New York common law claims for breach of contract, breach of the covenant of good faith and fair dealing, and negligence. (Not. of Removal Ex. A at 9–11 ("Compl."), ECF No. 1-1.)[6] On September 21, 2023, Beck filed an amended verified complaint ("Amended Complaint"). (Am. Compl.) The Amended Complaint makes substantively the same allegations and asserts the same three state-law causes of action as the original complaint. (Am. Compl. at 1, 6–9.) Both the original complaint and Amended Complaint named Chase and Metropolitan Bank Holding Corporation ("Metropolitan") as defendants. (Compl.; Am. Compl.)

*First*, the Amended Complaint alleges that Chase breached its contracts with Beck by: (1) failing to comply with the Agreements' requirement that all wire transfer requests go through an "internal review process"; and (2) by "failing to adopt and implement adequate security

---

[6] Citations to pages in the Notice of Removal reference the ECF-generated pagination.

procedures reasonably designed to protect [Beck] from [] fraudulent wire transfers" and instead only providing security measures to prevent "unauthorized access to [one's] account." (*Id.* ¶ 25, at 7.) The Amended Complaint does not allege facts explaining how Chase failed to comply with its "internal review process" for the Wire Transfers. Nor does it identify any specific provision of the Agreements breached by Chase's alleged failure to adopt and implement "adequate security procedures reasonably designed to protect" her from fraudulent wire transfers. (*See generally id.*)

*Second*, the Amended Complaint alleges that Chase's failure to adopt and implement adequate security procedures to protect Beck from sending wire transfers pursuant to a scam also violated the implied covenant of good faith and fair dealing because Chase failed to act in a "commercially reasonable manner consistent with the expectations of all parties." (*Id.* ¶¶ 29, 31, at 8.)

*Third*, the Amended Complaint alleges that Chase's failure to adopt and implement security measures constituted negligence. (*Id.* ¶ 34, at 9.) It asserts that Chase was "in the best position to identify fraudulent wire transfers and to adopt and implement security procedures reasonably designed to identify and prevent fraudulent wire transfers," but breached "a duty of care to exercise reasonable care in the adoption and implementation of" such security procedures. (*Id.* ¶¶ 34–37, at 9.)

All three of Beck's claims relate only to Beck's two wire transfer transactions, and not Beck's withdrawal of cash from the 9309 Account on February 15, 2023. (*Id.* ¶ 14, at 3.) The Amended Complaint does not allege that Chase was involved in this scam that led her to withdraw money and request the Wire Transfers. (*See generally* Am. Compl.)

On October 5, 2023, while this action was pending in state court, Beck voluntarily dismissed the claims against Metropolitan. (Not. of Removal Ex. A at 32.) On October 11, 2023,

Chase filed a Notice of Removal in this Court pursuant to 28 U.S.C. § 1446(b)(3), asserting this Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1). (*See* Not. of Removal.) On December 19, 2023, Beck filed a motion to remand the case to state court for lack of subject matter jurisdiction. (ECF No. 15.) On June 3, 2024, I denied Beck's motion, finding that the Court had jurisdiction over this action pursuant to 28 U.S.C § 1332(a) and that the removal of the case to federal court was timely. (Op. & Order Denying Remand ("Remand Op."), ECF No. 22.)[7]

On February 5, 2024, Chase filed the instant Motion to Dismiss pursuant to Rule 12(b)(6) and supporting submissions, along with Beck's submission in opposition, and Chase's reply. (ECF No. 19.) In support of the Motion, Beck submitted the affidavit of Lisamarie Cortese ("Cortese"), a Vice President, Branch Manager at Chase. (Cortese Aff., ECF No. 19-3.) Cortese attested that on February 17, 2023, Beck appeared in person at a Chase retail banking branch and executed a wire transfer agreement for $39,800 from her 9309 Account, and that on February 18, 2023, Beck appeared in person at a Chase branch and executed a second wire transfer agreement authorizing Chase to send $20,000 via wire transfer from the 9309 Account. (*Id.* at 1–2.)[8]

---

[7] I found that removal was timely pursuant to 28 U.S.C. § 1446(b)(3), because Chase filed a notice of removal within a week of the filing of a stipulation of dismissal of the only non-diverse defendant, Metropolitan, which rendered the case removable. (Remand Op. at 7, 22.)

[8] Unlike the Agreements, the facts set forth in the Cortese Affidavit are not appropriate to consider on a motion to dismiss. The Cortese Affidavit is not integral to the Amended Complaint because the Amended Complaint does not rely on information in the affidavit itself. *See Jajati*, 2024 WL 99659, at *2 (a document is "integral to a complaint" where the plaintiff has "(1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint.") (citing *Strock*, 982 F.3d at 63); *see also generally* Am. Compl. Indeed, the Affidavit appears to have been prepared after Beck filed the Amended Complaint in this case. (*Compare* Cortese Aff. at 2 (notarized on October 17, 2023) *with* Am. Compl. at 1 (noting the filing date of September 21, 2023)). I therefore do not consider it in resolving Chase's Motion. *See Jakob*, 639

Attached to the Cortese Affidavit are complete copies of the Agreements between Chase and Beck dated February 17, 2013, and February 18, 2023. (*Id.* at 2–14.)

## JURISDICTION

As addressed in this Court's resolution of Beck's motion to remand, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the amount in controversy exceeds $75,000. (*See* Remand Op. at 22.) First, at the time of removal, there was complete diversity between the parties because Chase was an Ohio citizen and Beck was a New York citizen. (*See id.*)[9] Second, Beck seeks $127,800 in damages, which exceeds the jurisdictional threshold of $75,000 for diversity actions. (Am. Compl. at 9.)

Venue in the Eastern District of New York is proper under 28 U.S.C. § 1391(b)(1)–(2). Plaintiff resides at an address in Suffolk County, and the alleged events took place in Chase bank branches located in Suffolk County, which is in the Eastern District of New York. (*Id.* ¶ 5, at 2; *id.* ¶¶ 18, 22, at 4–5.)

## STANDARD OF REVIEW

A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Green v. Dep't of Educ. of the City of New York*, 16 F.4th 1076–77 (2d Cir. 2021) (quoting

---

F. Supp. 3d at 411 (declining to consider an affidavit submitted in response to a motion to dismiss because it was not integral to the complaint).

[9] Chase is, and at the time of removal was, a citizen of Ohio because it is a national banking association with its main office in Columbus, Ohio, as set forth in its articles of association. ECF No. 16-5; *see also OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 218 (2d Cir. 2016). Beck is, and at the time of removal was, a New York citizen, as demonstrated by her continuous residence in New York since 2001, her New York driver's license, and her registration to vote in New York. (ECF No. 21-1.)

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In determining if a claim is sufficiently plausible to withstand dismissal," a court "accepts all factual allegations as true" and "draws all reasonable inferences in favor of the plaintiffs . . . ." *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021). Nevertheless, a court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *accord We The Patriots USA, Inc. v. Connecticut Off. of Early Childhood Dev.*, 76 F.4th 130, 144 (2d Cir. 2023). While "detailed factual allegations" are not required, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. A complaint fails to state a claim "if it tenders naked assertions devoid of further factual enhancement." *Id.*

## DISCUSSION

### I.    Preemption by the New York Uniform Commercial Code

Chase argues that the common law claims alleged in the Amended Complaint—breach of contract, breach of the implied covenant of good faith and fair dealing, and negligence—are all preempted by Article 4-A of the New York Uniform Commercial Code ("Article 4-A" and the "UCC"), which governs wire transfers. (Chase's Br. at 7.) Chase argues that these "claims pertain exclusively to wire transfers" (*id.* at 7–9), and that the parties' "dispute turns on the rights and liabilities of the parties regarding authorized wire transfers." (Chase's Reply at 3.) Chase

specifically argues that Section 202 of Article 4-A governs these claims because Beck authorized the wire transfers in this case by signing the Agreements. (*Id.*)

Beck argues that none of her common law claims are preempted by Article 4-A. (Beck's Br. at 4.) According to Beck, Chase relies on cases that are distinguishable because the Amended Complaint's allegations "do not concern the mechanics of the wire transfers themselves, whether the wire transfers were authorized, or the actual processing of the wire transfers." (*Id.* at 5–6.)

Based on my review of the Amended Complaint, the Agreements, and Article 4-A, I conclude that Beck's claims of negligence, breach of the implied covenant of good faith and fair dealing, and one part of her breach of contract claim are preempted by the UCC and dismiss them. To the extent that one part of Beck's breach of contract claim is not preempted—her theory that Chase breached the Agreements by failing to conduct the internal review required under Section 2 of the Agreements—the Amended Complaint fails to state a claim for breach of contract. Additionally, even if not dismissed as preempted, Beck's implied covenant of good faith and fair dealing claim is dismissed as duplicative of the breach of contract claim and Beck's negligence claim is dismissed for failure to state a claim because Beck has failed to provide authority establishing that Chase had any independent legal duty to second guess her authorization of wire transfers. As a result, the claims in the Amended Complaint are dismissed as preempted or, in the alternative, duplicative or implausible.

A.   Statutory Background

Article 4-A "governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers." *Niram, Inc. v. Sterling Nat'l Bank*, No. 21-cv-5966, 2023 WL 6394007 (S.D.N.Y. Sept. 29, 2023) (citing *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 797 (2d Cir. 2011) (quotation marks omitted), *appeal withdrawn*, No. 23-7661, 2024 WL

1985513 (2d Cir. Apr. 10, 2024). "[A] funds transfer," as defined in Article 4-A, is "also commonly referred to in the commercial community as a wholesale wire transfer." N.Y. U.C.C. § 4-A-102, Official Cmt.

Article 4-A was promulgated in order to "address the problems presented by the widespread use of electronic funds transfers." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89 (2d Cir. 2010).[10] Article 4-A created a "comprehensive body of law" that "use[s] precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability." N.Y. UCC § 4–A–102, Official Cmt.; *see also Ma*, 597 F.3d at 87–88, 89 (citing *Banque Worms v. BankAmer. Int'l*, 570 N.E.2d 189, 194 (N.Y. 1991)). The statute "reflects a deliberate decision . . . to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment." *Ma*, 597 F.3d at 89 (citing N.Y. UCC § 4–A–102, Official Cmt.) (quotation marks and brackets omitted). Thus, the drafters designed Article 4-A to be the "***exclusive means*** of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article." *Fischer*, 632 F.3d at 801 (quoting N.Y. U.C.C. § 4–A–102, Offical Cmt.) (emphasis supplied). Accordingly, Article 4-A precludes common law claims that arise out of wire transfers "when such claims would impose liability ***inconsistent with*** the rights and liabilities expressly created by Article 4-A." *Id.* at 797 (quotation marks omitted) (emphasis supplied). In other words, "resort to principles of law or equity outside of Article 4-A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article." N.Y. U.C.C. § 4-A-102, Official Cmt.

---

[10] Article 4-A was adopted by the New York State Legislature in 1990. *Ma*, 597 F.3d at 89.

"Not all common law claims," however, "are per se inconsistent with" Article 4-A. *Ma*,

597 F.3d at 89. As the Second Circuit explained in *Ma*,

> Article 4-A controls how electronic funds transfers are conducted and specifies certain
> rights and duties related to the execution of such transactions. It calls for banks to adopt
> certain security procedures (§§ 4–A–201, 202), controls the timing for executing
> payments (§ 4–A–301), and assigns responsibility for reporting erroneous electronic
> debits (§§ 4–A–304, 505). Claims that, for example, are not about the mechanics of how
> a funds transfer was conducted may fall outside of this regime.

*Id.*

The "critical inquiry" in determining whether Article 4-A has preempted a common law

cause of action is "whether its provisions protect against the type of underlying injury or

misconduct alleged in a claim." *Id.* at 89–90. For example, "a common law breach of contract

claim is not preempted by Article 4-A" when the contract's provisions are consistent with the

statute or "fall within one of the areas where" UCC provisions may be varied by agreement.

*Fischer*, 632 F.3d at 797.

"Under [A]rticle 4–A, a funds transfer is initiated by a 'payment order,' which is an

instruction from the person making the payment (the originator), to a 'receiving' or

'intermediary' bank to transfer the funds to the bank account of the beneficiary, normally in the

'beneficiary's bank.'" *U.S. Bank Nat'l Ass'n v. Zaccagnino*, 186 N.Y.S.3d 42, 45 (N.Y. App.

Div. 2023) (quoting N.Y. U.C.C. §§ 4-A-103, -104). Article 4-A defines the "[r]eceiving bank"

as "the bank to which the sender's instruction is addressed," and the "[b]eneficiary's bank" as

"the bank identified in a payment order in which an account of the beneficiary is to be credited

pursuant to the order or which is to make payment to the beneficiary if the order does not provide

for payment to an account." N.Y. U.C.C. § 4-A-103(1)(c)–(d). The "customer" is a person that

has an account with a bank or from whom the bank has agreed to receive payment orders. *Id.*

§ 4-A-105(1)(c). The "[s]ender" is the person giving the instruction to the receiving bank. *Id.*
§ 4-A-103(1)(e). If an individual issues a payment order to a bank to send a wire transfer from
her own account with that bank, that individual is both the customer and the sender for that
transaction.

"Whether the bank or customer bears the risk of loss for a fraudulent wire transfer is
determined by the interlocking provisions of Sections 4-A-202, 4-A-203, and 4-A-204" of
Article 4-A ("Section 202," "Section 204," and "Section 204"). *Essilor Int'l SAS v. J.P. Morgan
Chase Bank, N.A.*, 650 F. Supp. 3d 62, 75 (S.D.N.Y. 2023) (citing N.Y. U.C.C. §§ 4-A-202, -
203, -204).[11]

Under Section 204, a bank is liable to refund its customer where it "accepts a payment
order issued in the name of [that] customer as sender which is [] not authorized and not effective
as the order of the customer under [Section 202]." N.Y. U.C.C. § 4-A-204. In order words, the
bank must refund any wire transfer that is not "authorized" or otherwise "effective" as defined
by Section 202. *Id.*

Section 202 defines the situations under which a wire transfer is "authorized" or
otherwise "effective." *Id.* § 4-A-202. First, Section 202(1) recognizes that a wire transfer is the
"authorized" order of the customer in one of two situations: (1) where the customer authorizes
the order, or (2) where the person authorizing the order is able to bind the customer under the

---

[11] *See also* N.Y. U.C.C. § 4-A-203, Official Cmt. (describing how the scheme allocates the risk
of loss depending on whether a payment order is authorized or otherwise "verified"); *id.* § 4-A-
202(2) (explaining that when a payment order is "verified" pursuant to certain security
procedures, it is "effective").

law of agency. *Id.* § 4-A-202(1).[12] Even where a payment order is not considered an "authorized" order under Section 202(1), a payment may still be deemed "effective" under Section 202(2). *Id.* § 4-A-203(1). Section 202(2) provides that even where a payment order is *not* authorized, it is "effective" as the order of the customer where the bank and its customer agree on a security procedure to verify the wire transfer, the security procedure is commercially reasonable, and the bank accepted the payment order in good faith and in compliance with the security procedure. *Id.* § 4-A-202(2).[13]

---

[12] The term "authorized" is not otherwise defined in Article 4-A. Section 202(1) provides that "[a] payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound to it under the law of agency." N.Y. U.C.C. § 4-A-202(1). In the Official Comment to Sections 202 and 203, the drafters explained that under Section 202(1):

> the law of agency might allow the customer to be bound by an unauthorized order if conduct of the customer can be used to find an estoppel against the customer to deny that the order was unauthorized. If the customer is bound by the order under any of these agency doctrines, [Section 202(1)] treats the order as authorized and thus the customer is deemed to be the sender of the order.

*Id.* § 4-A-203, Official Cmt.

[13] Section 202(2) states, in full:

> If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (a) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (b) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer. The bank is not required to follow an instruction that violates a written agreement with the customer or notice of which is not received at a time and in a manner affording the bank a reasonable opportunity to act on it before the payment order is accepted.

*Id.* § 4-A-202(2).

Section 202(2) and Section 202(1) provide two separate situations under which a customer will be held liable for a payment order. In order words, whether a payment order was "authorized" under Section 202(1) does not depend on whether the bank complied with commercially reasonable security procedures under Section 202(2). *See id.* § 4-A-203, Official Cmt. ("A person in whose name a payment order is issued is considered to be the sender of the order if the order is 'authorized' as stated in [Section 202(1)] *or* if the order is 'verified' pursuant to a security procedure in compliance with [Section 202(2)] . . . .") (emphasis added); *see also id.* ("Under Section 4A-202, the issue of liability of the purported sender of the payment order will be determined by agency law . . . if the receiving bank did not comply with [Section 202(2)].").

Generally, if the wire transfer was either "authorized" under Section 202(1) or "effective" under Section 202(2), the bank does not have any obligation to refund the customer. *Cf. id.* § 4-A-204; *see also id.* § 4-A-203, Official Cmt.; *Essilor*, 650 F. Supp. 3d at 75.[14]

Section 203 provides a limited exception to this rule. *See* N.Y. U.C.C. § 4-A-203. Under Section 203, if a payment order is "effective" because it was properly verified as an order of the customer under Section 202(2), the receiving bank is still liable for the order where:

> the customer proves that the order was not caused, directly or indirectly, by a person (i) entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure, or (ii) who obtained access to transmitting facilities of the customer or who obtained, from a source controlled by the customer and without authority of the receiving bank, information facilitating breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault. Information includes any access device, computer software, or the like.

*Id.*

---

[14] The bank may have some refund obligation under Article 4-A where a customer attempts to cancel an authorized or effective order within a certain timeframe, *see* N.Y. U.C.C. § 4-A-211, but the facts alleged in the Amended Complaint do not implicate this obligation.

Generally, except as specifically provided in Sections 202 and 203, the "rights and obligations arising under [those Sections] may not be varied by agreement." *Id.* § 4-A-202(6). Under Section 212 of the UCC, "except as provided in [Article 4-A] or by express agreement," a receiving bank "does not . . . have any duty to accept a payment order, or before acceptance, to take any action, or refrain from taking action, with respect to the order . . . . and the bank owes no duty to any party to the funds transfer . . . ." *Id.* § 4-A-212.

## B. Analysis

The Wire Transfers are "funds transfers" as defined by Article 4-A. *See id.* §§ 4-A-103, 4-A-104(1). The allegations in the Amended Complaint and the face of the Agreements show that Beck was the customer, sender, and originator of both the Wire Transfers because: (1) she had a bank account with Chase;[15] and (2) she issued the instructions to Chase to send the Wire Transfers.[16] *Zaccagnino*, 186 N.Y.S.3d at 45; N.Y. U.C.C. §§ 4-A-103(iii)(e), -104(3), -105(c). Chase was the receiving bank because the instructions from Beck, the sender, were addressed to Chase. N.Y. U.C.C. § 4-A-103(d).[17] The beneficiaries of the Wire Transfers were Gyorgy Bora and Miss Iosif Lacatos, who Beck alleges were affiliated with the Scammers. *Id.* § 4-A-103(d).[18] Metropolitan was the beneficiaries' bank. *Id.* § 4-A-103(c).[19]

---

[15] Am. Compl. ¶ 9, at 2.

[16] Am. Compl. ¶¶ 18, 21, 23–24, at 4–5; *see also* Agreements at 7, 13.

[17] *See also* Am. Compl. ¶¶ 18, 21, 23–24, at 4–5; Agreement 1 at 4, 7; Agreement 2 at 10, 13.

[18] *See also* Am. Compl. ¶¶ 18, 21, 23–24, at 4–5; Agreement 1 at 4; Agreement 2 at 10.

[19] *See also* Am. Compl. ¶¶ 18, 21, 23–24, at 4–5; Agreement 1 at 4; Agreement 2 at 10. The Agreements list Metropolitan as the "receiving bank." (Agreements at 7, 13.) Because the Wire Transfers were instructions addressed to Chase to cause Metropolitan to pay beneficiaries, however, the Chase is the "receiving bank" as defined by Article 4-A. N.Y. U.C.C. § 4-A-

As an initial matter, to the extent that Chase argues that Article 4-A "preempts all common law claims," Chase is incorrect. (Chase's Reply at 1.) As the Second Circuit has explained, "[n]ot all common law claims are per se inconsistent with" Article 4-A. *Ma*, 597 F.3d at 89. The Second Circuit's conclusion in *Ma* is consistent with the plain language of the statute and previous New York Court of Appeals decisions. *See* N.Y. U.C.C. § 1-103 ("Unless displaced by the Particular provisions of this Act, the principles of law and equity . . . supplement its provisions."); *see also id.* § 4-A-102, Official Cmt.; *Hechter v. N.Y. Life Ins. Co.*, 385 N.E.2d 551 554 (N.Y. 1978). Thus, the "critical inquiry" is whether Beck's claims of breach of contract, breach of the implied covenant of good faith and fair dealing and negligence are preempted by Article 4-A because "its provisions protect against the type of underlying injury or misconduct alleged" in each of these claims. *Ma*, 597 F.3d at 89–90.

Article 4-A does not preempt Beck's claim that Chase breached the Agreements by failing to comply with Section 2 of these Agreements, which requires that all wire transfer requests go through in "internal review process." (Am. Compl. ¶ 24, at 7.) This claim concerns the protocols followed before the two Wire Transfers were executed, and thus touches on "the mechanics of how a funds transfer was conducted." *Ma*, 597 F.3d at 89. Nevertheless, even a common law claim "arising from electronic funds transfers" is not precluded when it does not "create rights or obligations inconsistent with those created by . . . Article 4-A." *Fischer*, 632 F.3d at 798. Under *Fischer*, a breach of contract claim is not preempted when it concerns an area in which Article 4-A permits the parties to vary their rights by agreement and the relevant

---

103(1)(a), (d). Metropolitan is the "beneficiaries' bank" under Article 4-A because it was "the bank identified in the payment order in which an account of the beneficiary is to be credited pursuant to the order." *Id.* § 4-A-103(1)(c).

contractual provisions are "not inconsistent with the rights created by the U.C.C." 632 F.3d at 797. The requirement that Chase conduct an internal review for all wire transfers is entirely consistent with Section 202(2), which provides that a bank and its customer may "agree[] that the authenticity of payments orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure." N.Y. U.C.C. § 4-A-202(2). An "internal review process" could be a "security procedure" under Section 202(2), which is defined as a procedure "established by agreement of a customer and a receiving bank for the purpose of (1) verifying that a payment order or communication amending or cancelling a payment order is that of the customer, or (2) detecting error in the transmission or the content of the payment order or communication." *Id.* § 4-A-201.

Article 4-A does preempt all of Beck's remaining claims, however, because the claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4-A. Each of these claims is predicated on Chase's acceptance of Beck's authorized payment order and the allegation that Chase did not adhere to additional security measures to prevent wire transfers that Beck authorized due to the fraudulent representations of a third party. First, Beck claims that Chase breached the Agreements by "failing to adopt and implement adequate security procedures reasonably designed to protect Plaintiff from [the] fraudulent wire transfers" that she authorized, because the Agreements only provide for security measures to prevent "unauthorized access to [one's] account." (Am. Compl. ¶¶ 24–25, at 7.) Second, Beck claims that Chase's failure to adopt and implement adequate security procedures to prevent Beck from sending wire transfers pursuant to a scam also violated the implied covenant of good faith and fair dealing because Chase failed to act in a commercially reasonably manner consistent with the

expectations of all parties. (*Id.* ¶ 29–30, at 8). Third, Beck alleges that this failure to adopt and implement security measures constituted negligence. (*Id.* ¶¶ 34–37, at 9.)

Through all three of these claims, Beck seeks to hold Chase liable for the two payment orders that she authorized, arguing that her authorization was based on the alleged fraudulent representations of third parties. But holding Chase liable in this context, where Beck authorized both Wire Transfers (Agreements at 7, 13; Am. Compl. ¶¶ 17–18, 22), is inconsistent with Article 4-A, which establishes that where the plaintiff "duly authorized [the] wire transfer requests" at issue—even where the "plaintiff was allegedly induced to take that action by various fraudulent representations made by [a] third party" —there is no "legally cognizable cause of action" under Section 202. *Blum v. Citibank, NA*, 81 N.Y.S.3d 51 (N.Y. App. Div. 2018); *see also Wellton Int'l Express v. Bank of China (Hong Kong)*, 612 F. Supp. 3d 358, 363–64 (S.D.N.Y 2020) (finding that a bank cannot be held liable under Article 4-A where the wire transfer "was unequivocally authorized," even where the wire transfer was erroneously made based on fraudulent representations by a computer hacker).

Unlike Section 202(2), under which a bank can avoid liability for unauthorized transfers if the bank abides by certain security procedures, Article 4-A does not require banks to bear the risk of loss for failing to abide by certain security procedures where the sender has *directly authorized the transfer* under Section 202(1). *See* N.Y. U.C.C. § 4-A-202, -204; *Wellton*, 612 F. Supp. 3d at 363–64 (holding that the security measures required under Section 202(2) did not apply to a case where the wire transfer "was unequivocally authorized," because Section 202(2) "is an exception to the default rule that the bank bears the loss of any unauthorized funds transfer."); N.Y. U.C.C. § 4-A-203, Official Cmt. ("Prudent banking practice may require that

security procedures be utilized in virtually all cases except for those in which personal contact between the customer and the bank eliminates the possibility of an unauthorized order.").

Beck argues that under the Second Circuit's decision in *Ma*, "common law claims that do not relate to the mechanics of how a funds transfer was conducted are not preempted by the UCC." (Beck's Br. at 5.) This is inaccurate. In *Ma*, the Second Circuit merely recognized that "[c]laims that . . . are not about the mechanics of how a funds transfer was conducted *may* fall outside of" Article 4-A because those claims are likely not inconsistent with it. *Ma*, 597 F.3d at 89 (emphasis supplied). Nevertheless, Beck is incorrect that one part of her breach of contract claim along with her claims for breach of the implied covenant of good faith and fair dealing and negligence "do not concern the mechanics of the wire transfers themselves." (Beck's Br. at 6.) These claims are about the security procedures that Chase implemented, or failed to implement, in accepting Beck's payment orders. A bank's security procedures pertaining to the acceptance of a payment order is one of the "mechanics of wire transfers" to which the Second Circuit referred in *Ma*. *See Ma*, 597 F.3d at 89.[20]

With the exception of one part of Beck's breach of contract claim, Beck's common-law claims all rest on a theory of liability that directly contravenes the rights and liabilities defined in Article 4-A.[21] Accordingly, the claims of negligence and breach of the implied covenant of good

---

[20] Beck also incorrectly states that the New York Court of Appeals held in *Hechter* that the UCC does not preempt any claim grounded in common law. (Beck's Br. at 5 (citing *Hechter*, 385 N.E.2d at 553–54).) The New York Court of Appeals instead found that a different provision of the UCC did not abolish common law causes of action where there is not "an express code provision limiting plaintiff's remedy." *Hechter*, 385 N.E.2d at 554.

[21] Courts in other states that have adopted Article 4-A have likewise held that common law claims are preempted where the sender authorized a wire transfer due to a scammer's instruction. *See Navy Fed. Credit Union v. Lentz*, 890 S.E.2d 827 (Va. Ct. App. 2023) (holding that an elderly consumer's negligence claim against a credit union for failing to intervene when the

faith and fair dealing are preempted by Article 4-A, as is Beck's breach of contract claim based on Chase's alleged failure to adopt and implement additional security procedures reasonably designed to protect Beck from fraudulent wire transfers.[22]

## II.   Breach of Contract Claim

Chase argues that even if Beck's breach of contract claim is not preempted by the UCC, Beck has nevertheless failed to state a cause of action for breach of contract. (Chase's Br. at 11.) Beck argues that the Agreements are "highly ambiguous" and there are issues of fact and law regarding a breach of contract claim that warrant discovery. (Beck's Br. at 10.)

"[T]o plead a cause of action for breach of contract, a plaintiff usually must allege that: (1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022) (citations omitted).

---

customer made wire transfers as directed by a scammer were preempted by Article 4-A as adopted by Virginia); *see also BPi Bright Power, Inc. v. Umpqua Holding Corp.*, 669 F. Supp. 3d 904, 905–06 (N.D. Cal. 2023) (common law claims arising from bank's acceptance of wire transfer that the customer authorized pursuant to a scam were preempted by Article 4-A as adopted by California); *Pope v. Wells Fargo Bank, N.A.*, No. 23-cv-86, 2023 WL 9604555, at *4 (D. Utah Dec. 27, 2023), *R. & R. adopted*, 2024 WL 555133 (D. Utah Feb. 9, 2024) (same under Utah's Article 4-A); *but see Bloom v. PNC Bank, N.A.*, 659 F. Supp. 3d 27 (D.D.C. 2023) (Article 4-A as adopted by the District of Columbia did not preempt common law claims of breach of contract and negligence against a bank for accepting a wire transfer by a customer issued because the customer fell victim to a scam).

[22] Chase further argues that even if Beck asserted a claim under Article 4-A, the claim would fail because the Wire Transfers were authorized and effective. (Chase's Br. at 9–11.) Beck has not asserted such a claim and has not asked to amend the Amended Complaint. Accordingly, I will not reach this issue.

There is no dispute that the parties have a contract in the form of the two Agreements. Chase argues that Beck has failed to sufficiently allege the third element—that Chase breached any provision of the Agreements. (Chase's Br. at 11.)

As discussed, the Amended Complaint pleads a breach of contract claim based on two theories. The first is that Chase "breached its contractual obligations by failing comply with Section 2 of the [Agreement] requiring that all wire transfer requests must go through an internal review process." (Am. Compl. ¶ 24, at 7.)[23] Chase argues that the Agreements "on their face" demonstrate that Chase *did* conduct an internal review process before remitting funds to the beneficiaries' banks. (Chase's Br. at 12.) The final page of both the Agreements reflects that each wire transfer "was reviewed and approved by Chase branch personnel" and that "one Chase branch employee initiated the wire [transfer] and a different branch employee reviewed and approved the wire [transfer]." (*Id.* (citing Agreement 1 at 8; Agreement 2 at 14)).

While courts must take all factual allegations in the complaint as true on a motion to dismiss and draw from them all reasonable inferences, courts are "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Richardson v. Edgewell Pers. Care, LLC*, No. 23-128, 2023 WL 7130940, at *1 (2d Cir. Oct. 30, 2023). Here, the Amended Complaint's sole allegation that Chase "fail[ed] [to] comply with Section 2 of the [Agreement]" is a legal conclusion—that Beck breached the Agreements—couched as a factual allegation. The Amended Complaint does not provide any additional factual allegations from which I can draw an inference that Chase did *not* conduct its internal review in accordance with Section 2, and nothing in the Agreements permits me to make that inference. Indeed, the fact that

---

[23] *See* Agreement 1 § 2, at 5 (requiring that "[a]ll wire transfer requests go through an internal review"); Agreement 2 § 2, at 11 (same).

both Agreements reflect that one Chase employee initiated each wire transfer while a different Chase employee approved each wire transfer suggests that Chase did in fact comply with Section 2 of the Agreements by conducting an internal review. (*See* Agreement 1 at 8; Agreement 2 at 14.)

The second part of Beck's breach of contract claim fares no better. The Amended Complaint alleges a second breach of contract theory: that Chase "breached its contractual obligations to [Beck] by failing to adopt and implement adequate security procedures reasonably designed to protect [Beck] from [the] fraudulent wire transfers" that Beck authorized, because the Agreements only provide for security measures to prevent "unauthorized access to [one's] account." (*Id.* ¶ 25, at 7.) The Amended Complaint does not identify any provision of the Agreements breached by Chase's alleged failure to adopt and implement such security procedures. (*See id.* ¶¶ 22–26, at 7.) Chase argues that there is no contractual provision in the Agreements giving rise to such an obligation, and that by signing the Agreements, Beck agreed that the security measures set forth in them are "reasonable." (Chase's Br. at 12.)

The allegations in the Amended Complaint, considered together with the Agreements, are insufficient to support a claim for breach of contract because they do not plausibly allege that the Agreements required Chase to "adopt and implement security procedures reasonably designed to protect [Beck]" from wire transfers that Beck authorized due to misrepresentations of a third party. (*See* Agreement 1; Agreement 2.)

Section 2 of the Agreements obligates Chase to undertake certain security procedures, including requiring the presentation of valid identification for wire transfers initiated in a Chase branch location. (*See* Agreement 1 § 2; Agreement 2 § 2.) The Agreements explicitly disclaim any duty to impose additional security measures beyond those stated in the contract, providing

that while Chase "may impose stricter security procedures for any particular wire transfer . . . [it] ha[s] no obligation to do so" and that even if Chase "choose[s] to impose stricter security procedures, . . . [it] will not be obligated to impose such security procedures in the future." (Agreement 1 § 2; Agreement 2 § 2.) Further, Beck admits that "under the plain language of Section 2 of the [Agreements], it appears that any 'security procedures' set forth therein are designed only to prevent 'unauthorized access' to customers' accounts." (Beck's Br. at 10.)

Beck argues, however, that because the Agreements do not require Chase to enact and apply additional security measures, there are "issues of law and fact" that warrant discovery in this case. (*Id.*) For example, Beck suggests that other "pertinent documents" could "exist" that "impos[e] separate and independent legal obligations upon Defendant in relation to the wire transfers." (*Id.*) This is pure speculation, and thus does not meet the plausibility standard of a motion to dismiss. *See Iqbal*, 556 U.S. at 678 (the plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully").

Beck further argues that "the language contained in Section 2 is highly suggestive that wire transfers would undergo a thorough and reasonably adequate review in light of the language 'we may need to contact you' and 'we may impose stricter security procedures' . . . ." (Beck's Br. at 10.) This argument is unavailing. As stated above, the remainder of Section 2 specifically disclaims any duty to impose additional security measures. (Agreement 1 § 2; Agreement 2 § 2.)

Lastly, the cases on which Beck relies are inapposite. Beck relies primarily on *Jakob*, 639 F. Supp. 3d 406, which Beck claims is a case that presented "similar circumstances." (Beck's Br. at 9.) The court in *Jakob* found that the plaintiff sufficiently alleged that the defendant breached a provision of a wire transfer agreement permitting a customer to cancel a wire transfer before it was processed. *Jakob*, 639 F. Supp. at 411–14. Thus, the contract in *Jakob* specifically provided

26

a duty that the defendant was alleged to have breached—unlike in this case, where the Amended

Complaint fails to identify any specific provision in the Agreements obligating Chase to enact

security procedures reasonably designed to protect Beck from wire transfers that Beck authorized

due to misrepresentations of a third party.[24]

Accordingly, even if Article 4-A does not preempt the first part of Beck's breach of

contract claim based on a theory that Chase failed to conduct an internal review prior to

completing the wire transfers, Beck fails to state a plausible breach of contract claim under either

of the two theories set forth in the Amended Complaint. Based on the Amended Complaint and

the Agreements, and drawing all inferences in favor of Beck, it is implausible that Chase

breached the Agreements either by failing to comply with the "internal review" process required

by Section 2 or by failing to enact and abide by additional security measures to prevent wire

transfers authorized by Beck due to misrepresentations by a third party.[25]

---

[24] Beck's other cases are also distinguishable. (*See* Beck's Br. at 6.) In *Tillage Commodities Fund, L.P. v. SS&C Techs., Inc.*, an investment fund sued its funds administrator for breach of contract, among other claims, for processing fraudulent wire transfers from plaintiff's account. No. 654765/2016, 2016 WL 7489227 (N.Y. Sup. Ct. Dec. 22, 2016), *aff'd as modified*, 151 A.D.3d 607 (N.Y. App. Div. 2017). The court held that the contract "is a lengthy document that imposes significant responsibilities on SS&C," and that "the pleadings suffice to state a cause of action" for breach of contract. *Id.* at *1. This case is distinguishable from *Tillage* in at least two critical ways. First, the defendant in that case was a funds administrator, and accordingly, the agreement to provide administration services imposed additional continuing obligations on defendant that are not present in this case, where the contracts at issue are each for a single wire transfer. Second, the Agreements in this case explicitly disclaim any obligation to provide additional security measures beyond those provided for in the Agreements. (Agreement 1 § 2; Agreement 2 § 2.) *Assured Guaranty Ltd. v. JP Morgan Investment Mgmt., Inc.*, is also distinguishable. 18 N.Y.3d 341, 350–51 (N.Y. 2011). Although Beck asserts otherwise, the New York Court of Appeals did not consider any breach of contract claim in that case. *See id.* at 249 n.1 (noting that because the appellee did not assert a position regarding the appellant's breach of contract claim, the court "ha[s] no occasion to address it on this appeal").

[25] Chase raises an additional argument that Beck cannot assert a cause of action against Chase for breach of the Agreements because by executing the Agreements, Beck agreed to an

### III.  Breach of the Implied Covenant of Good Faith and Fair Dealing

Next, Chase argues that even if Article 4-A does not preempt the claim for breach of the implied covenant of good faith and fair dealing, this claim should be dismissed as duplicative of Beck's breach of contract claim. (Chase's Br. at 14–15.) In response, Beck argues that this claim is not duplicative of the breach of contract claim for two reasons—neither of which address the duplicity argument. (Beck's Br. at 13.) First, Beck asserts that the allegations in the Amended Complaint show that Chase "might have engaged [in] gross negligence given the amount of red flags regarding the fraudulent nature of the wire transfers." (*Id.*) Second, Beck contends that the fact that the Agreements provide security procedures "only to help prevent unauthorized access to" the account of the person requesting the wire transfer demonstrates that there are questions of fact as to whether Chase has adopted and implemented any security procedure reasonably designed to protect Beck's account from such fraudulent wire transfers. (*Id.*)

Chase is correct that the breach of the implied covenant claim is duplicative of the breach of contract claim. The same alleged facts give rise to both claims, and both claims allege identical damages. Thus, even if this claim is not preempted by Article 4-A, it is dismissed as duplicative.

#### A.  Legal Standards

Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance." *Brown v. Erie Ins. Co.*, 207 A.D.3d 1144, 1144 (N.Y. App. Div.

---

indemnification provision. (Chase's Br. at 13; Chase's Reply at 6 n.4.) Because I have found that Beck has failed to sufficiently plead a claim for breach of contract, I need not reach this issue. Chase also argues in a footnote that should Beck request leave to amend the Amended Complaint, I should deny that request because any amendment would be futile. (Chase's Br. at 14 n.5.) I do not need to reach this issue as Beck has not requested leave to amend.

2022). This covenant "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Gottwald v. Sebert*, 148 N.Y.S.3d 37, 47 (N.Y. App. Div. 2021), *aff'd as modified*, 40 N.Y.3d 240, (N.Y. App. Div. 2023). This covenant is breached when "one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other." *Rayham v. Multiplan, Inc.*, 61 N.Y.S.3d 90, 94 (N.Y. App. Div. 2017).

A claim for breach of the implied covenant of good faith and fair dealing is properly dismissed as duplicative where the claim "arises from the same operative facts and seeks the same damages as the breach of contract claim." *New York State Workers' Comp. Bd. v. Program Risk Mgmt., Inc.*, 155 A.D.3d 1484, 1488 (N.Y. App. Div. 2017); *see also MD3 Holdings, LLC v. Buerkle*, 174 A.D.3d 1309, 1311 (N.Y. App. Div. 2019) (breach of implied covenant claim is duplicative of a breach of contract claim where the former "is premised on the same conduct as the breach of contract claim and is intrinsically tied to the damages allegedly resulting from a breach of the contract") (quotation marks omitted); *Tillage*, 151 A.D.3d at 608 (affirming dismissal of a breach of implied covenant of good faith and fair dealing as duplicative of the breach of contract claim because the claims were "based on the same allegations and s[ought] the same damages").

### B. Analysis

In support of the first claim for breach of contract, the Amended Complaint alleges:

That Defendant JPMorgan Chase bank breached its contractual obligations to Plaintiff by failing comply with Section 2 of the [Agreement] requiring that all wire transfer requests must go through an internal review process.

Furthermore, because Section 2 of the [Agreement] specifically states that "such security procedures are only to help prevent unauthorized access to your account …," Defendant JPMorgan Chase Bank breached its contractual obligations by

failing to adopt and implement adequate security procedures reasonably designed to protect Plaintiff from the fraudulent wire transfers described at issue.

(Am. Compl. ¶¶ 24–25, at 7.)

In support of the second cause of action for breach of the implied covenant of good faith and fair dealing, Beck alleges:

Section 2 of the [Agreement] specifically states that such "security procedures are only to help prevent unauthorized access to your account." Therefore, Defendant JPMorgan Chase Bank breached the covenant of good faith and fair dealing by failing to adopt and implement adequate security procedures reasonably designed to protect Plaintiff from the fraudulent wire transfers described herein.

That, by failing to adopt and implement adequate security procedures reasonably designed to protect Plaintiff from sending fraudulent wire transfers, Defendants violated this implied covenant of good faith and fair dealing by failing to act in a commercially reasonable manner consistent with the expectations of all parties.

(Am. Compl. ¶¶ 29, 31, at 8).

The allegations supporting these two claims arise out of the Wire Transfers at issue in this case and the security procedures that Chase allegedly failed to provide when accepting the Wire Transfers. Thus, both causes of action arise from the same operative facts and therefore are "premised on the same conduct." *Buerkle*, 174 A.D.3d at 1311. As to damages, both the first and second causes of action allege identical damages using the same sentence: "Plaintiff has incurred monetary loss and damages in an amount no less than $77,800, pain and suffering in an amount to be determined at trial, plus the legal fees and costs and disbursements associated with this action." (*Id.* ¶ 26, at 7; *id.* ¶ 32, at 8.) In her brief, Beck does not attempt to argue that these claims allege different damages or arise out of different facts. (*See* Beck's Br. at 13.) Instead, Beck asserts that the allegations establish "gross negligence" and that there are "questions of fact as to whether [Chase] has adopted and implemented any [security procedures] reasonably designed to protect [Beck]'s account from such fraudulent wire transfers." (*Id.*) These arguments

are irrelevant to the inquiry of whether the claim for breach of the implied covenant of good faith and fair dealing is duplicative of the breach of contract claim.

While Beck relies on *Bayerische Landesbank v. Aladdin Capital*, 692 F.3d 42 (2d Cir. 2012) and *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289 (N.Y. 1995), neither case concerns or addresses the argument that the claim for breach of the implied covenant of good faith and fair dealing was duplicative of a breach of contract claim. (*Id.* at 12.) Because the two claims are based on the same alleged facts and allege the exact same damages, the claim for breach of the implied covenant of good faith and fair dealing is dismissed as duplicative of the breach of contract claim. *Buerkle*, 174 A.D.3d at 1311; *New York State Workers' Comp. Bd.*, 155 A.D.3d at 1488; *Tillage*, 151 A.D.3d at 608.

## IV.   Negligence Claim

Lastly, Chase argues that even if Beck's negligence claim is not preempted by Article 4-A, it would still be barred by the doctrine of "economic loss," which precludes a plaintiff from asserting a tort claim "where the injury alleged is primarily the result of economic injury for which a breach of contract claim is available." (Chase's Br. at 16–17 (citing *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp.3d 662, 687 (S.D.N.Y. 2019).) Chase argues that Beck has failed to allege any legal duty that Chase owed Beck apart from its obligations under the Agreements. (*Id.* at 17.) Beck argues that Chase's actions were governed by a duty of care independent of the duties imposed by the Agreements. (Beck's Br. at 14, 15.)

### A.   Legal Standards

In order "to establish a claim of negligence, a plaintiff must prove: a duty owed to the plaintiff by the defendant, a breach of that duty, and injury proximately resulting therefrom."

*Moore Charitable Found. v. PJT Partners, Inc.*, 40 N.Y.3d 150, 157 (N.Y. 2023) (citations omitted); *see also Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002).

The New York doctrine of "economic loss . . . stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer." *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 220 N.E.3d 646, 656 (N.Y. 2023). In *IKB International*, the New York Court of Appeals noted that some New York courts and federal courts applying New York law had "conflate[d]" New York's "economic loss rule with the prohibition against duplicative contract and tort remedies." *Id.* (quotation marks omitted). The New York Court of Appeals clarified that the economic loss doctrine "does not have application beyond the products liability context," and that in other contexts, courts should "instead evaluate . . . tort claims to determine whether they are duplicative of the contract claims." *Id.* Under this analysis, "[a] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated" and "where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." *Id.* (quotation marks omitted); *see also Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (N.Y. 1987) (same). In *Clark-Fitzpatrick*, for example, the New York Court of Appeals dismissed a negligence claim where "[e]ach of the[] allegations" supporting that claim was "merely a restatement, albeit in slightly different language, of the 'implied' contractual obligations asserted in the cause of action for breach of contract . . . ." 70 N.Y.2d at 390 (citation omitted).

In order to determine whether a tort claim is duplicative of a contract claim, courts "evaluate[ ] the nature of the injury, how the injury occurred and the harm it caused." *IKB Int'l*, N.E.3d at 656.

B.  Analysis

Here, Beck's negligence claim is duplicative of her breach of contract claim because the

negligence claim does not arise out of any legal duty independent of the contract and it does not

allege any separate injuries.

As previously stated, the allegations in support of the breach of contract claim are as

follows:

> That Defendant JPMorgan Chase bank breached its contractual obligations to
> Plaintiff by failing comply with Section 2 of the [Agreement] requiring that all
> wire transfer requests must go through an internal review process.
>
> Furthermore, because Section 2 of the [Agreement] specifically states that "such
> security procedures are only to help prevent unauthorized access to your account
> …," Defendant JPMorgan Chase Bank breached its contractual obligations by
> failing to adopt and implement adequate security procedures reasonably designed
> to protect Plaintiff from the fraudulent wire transfers described at issue.

(Am. Compl. ¶¶ 24–25, at 7.) In support of the claim of negligence, the Amended Complaint

states:

> That Defendants, by reasons of their resources, access to information and
> business acumen, was and is in the best position to identify fraudulent wire
> transfers and to adopt and implement security procedures reasonably designed to
> identify and prevent fraudulent wire transfers.
>
> Based on the forging, together with the terms of the FTS Agreement,[26]
> Defendants owed Plaintiff a legal duty of care to exercise reasonable care in the
> adoption and implementation of said security procedures.
>
> That Defendants, by reason of their failure to adopt and implement
> adequate security procedures reasonably designed to protect Plaintiff from
> sending fraudulent wire transfers, breached such duty of care by failing to act in a
> reasonably prudent matter under the circumstances described herein.

(*Id.* ¶¶ 36, at 9.)

---

[26] The Amended Complaint uses the terms Agreement and "funds transfer agreement"
interchangeably. (*See e.g.* Am. Compl. ¶¶ 29–30, at 6.) While Beck does not explicitly define
"FTS Agreements," I understand these allegations to refer to the "funds transfer agreements," or
the Agreements.

The Amended Complaint further alleges that Chase "had both a contractual and implied legal duty to exercise reasonable care by adopting and implementing security procedures reasonably designed to identify and prevent fraudulent wire transfers," and that "[d]espite numerous red flags and warning, Defendants breached such duties by failing to implement adequate security procedures . . . reasonably designed to identify and prevent fraudulent wire transfers." (Am. Compl. ¶¶ 2–3.)

The plain text of the Amended Complaint alleges that Chase owed Beck the *same duties* under both the negligence and breach of contract claims—namely the duty to adopt and implement adequate security procedures reasonably designed to protect Beck from the kinds of wire transfers alleged in this case. (*Id.* ¶ 24, at 7; *id.* ¶ 36, at 9.)

Beck argues that "there are issues of fact as to whether [Chase] had implied notice of the wire transfers' fraudulent nature given the numerous and obvious red flags," which Beck argues would give rise to a duty under *Lerner v. Fleet Bank*, 459 F.4d 273, 287–88 (2d Cir. 2006). (Beck's Br. at 16.) In *Lerner*, the Second Circuit considered a claim of fiduciary misappropriation. 459 F.4d at 287–88. But *Lerner* does not establish that Chase had a duty of care to Beck independent of the Agreements because Beck's account with Chase was not any sort of fiduciary account. *See id.* Other than an inapplicable duty with respect to fiduciary accounts, Beck cannot identify another legal duty that Chase owed Beck that is independent of the Agreements in this case. Indeed, Section 212 of Article 4-A clearly provides that "except as provided in [Article 4-A] or by express agreement," the receiving bank "owes no duty to any party to the funds transfer" and does not have "any duty . . . to take any action, or refrain from taking action, with respect to a [payment] order" before it accepts that order. N.Y. U.C.C. § 4-A-212.

The harms Beck alleges for her breach of contract and negligence claims further demonstrate that these claims are duplicative. *See, e.g., IKB Int'l*, 220 N.E.3d at 657 (finding claims duplicative where the breach of contract claim alleged identical damages to the tort claim). For the negligence claim, Beck alleges that she "has suffered harm and damages in an amount not less than $77,800, pain and suffering in an amount to be determined at trial but not less than $50,000, plus the legal fees and costs and disbursements associated with this action." (Am. Compl. ¶ 37, at 9.) This phrase is repeated verbatim in support of Beck's breach of contract claim, except that instead of "has suffered harm and damages," the breach of contract damages provision states that Beck "has incurred monetary loss and damages." (*Id.* ¶ 26, at 7.) Accordingly, like the plaintiff in *IKB International*, Beck alleges "no injury . . .  that a separate tort claim would include that is not already encompassed in [Beck's] contract claim." *IKB Int'l*, 220 N.E.3d at 657 (quotation marks omitted).

Beck has failed to point to any duty of care that Chase owed her separate and apart from its obligations under the Agreements. Accordingly, Beck has failed to plead a negligence claim that is not duplicative of her breach of contract claim.

## CONCLUSION

For the reasons set forth above, I dismiss all three of Beck's claims. The part of Beck's breach of contract claim alleging that Chase violated Section 2 of the Agreements is not preempted by Article 4-A, but is dismissed for failure to state a claim. Beck's claims for negligence and the breach of the implied covenant of good faith and fair dealing and the part of the breach of contract claim based on the allegation that Chase failed to implement reasonable security measures are all dismissed as preempted by Article 4-A, or in the alternative, are dismissed for failure to state a claim.

Accordingly, Chase's Motion to Dismiss (ECF No. 15) is granted.


Dated: Central Islip, New York
August 16, 2024

                                        _/s/ Nusrat J. Choudhury_
                                        NUSRAT J. CHOUDHURY
                                        United States District Judge